FILED

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ALABAMA**
**EASTERN DIVISION**

99 JUN 16 AM 10: 37

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | |
|---|---|
| ALAN INGRAM, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | )   CV 98-PT-2839-E |
| | ) |
| ACOSTA-PMI, INC., | ) |
| | ) |
| Defendant. | ) |

**ENTERED**

**MEMORANDUM OPINION**

IJUN 16 1999

### I. Background and Summary of Claims

This cause comes to be heard on defendant Acosta-PMI, Inc.'s
("Acosta") Motion for Summary Judgment filed on April 5, 1999 and
plaintiff Alan Ingram's ("Ingram") Motion for Summary Judgment
filed on April 1, 1999.  Ingram, formerly an employee of Acosta,
was fired by the company on September 10, 1998, allegedly as a
result of his poor work performance.  Ingram claims that his
termination stemmed from his having taken the weeks of August 24
and August 31, 1998 off due to a back injury.  On November 12,
1998, Ingram filed his complaint in this action alleging that
Acosta, in terminating his employment and in dealing with his
request for leave, violated his rights under the Family and Medical
Leave Act of 1993 ("FMLA" or the "Act"), 42 U.S.C. § 1201 et. seq.
Count I of the complaint alleges that Acosta violated the FMLA by
terminating Ingram's employment following his return to work from
medical leave.  Count II seeks recompense for Acosta's failure to
notify Ingram of FMLA policies in connection with his injury.



Count III claims that Acosta interfered with Ingram's rights under the FMLA by failing to inform Ingram in a timely manner as to whether his medical leave was granted or denied under the FMLA and by pressuring him to return to work. Finally, Count IV of the complaint claims that Acosta negligently failed to follow the requirements of the FMLA, thus violating Alabama Law.

II. Factual Contentions

A. Facts as Presented by Ingram

Ingram claims to have injured his back on Sunday, August 23, 1998. On the morning of August 24, 1998, he called his supervisor, Ken Benton, to inform Benton that he would be unable to attend work that day due to that injury. He left a message on Benton's voice mail informing Benton of the situation. Ingram visited a chiropractor that day, who allegedly told him that it would probably be about two more days before he could return to work. Ingram's wife claims that Ingram notified Benton on the 24th about the chiropractor's diagnosis and told Benton that it would be a couple of days before he could come back to work.

Ingram's wife also claims that, despite having been notified on the 24th about the status of Ingram's injury, Benton called Ingram's home on the 25th to find out about when Ingram would return to work. Mrs. Ingram claims that she told Benton that her husband could not yet return to work. On the 26th, Ingram was taken by his wife to the emergency room for treatment of his back. Benton allegedly called the Ingram residence on the 27th to determine whether or not Ingram would return to work the following day. Ingram's wife claims that she informed Benton that the doctor had not yet cleared Ingram to work. Benton called again on the 28th and

was again told that Ingram could not yet work.

During the next weekend, Ingram's wife allegedly called Benton to inform him that Ingram, because of his injuries, would not be able to work for the entire next week. Ingram contends that Benton called three or four times during that next week, attempting to get Ingram to return to work. Mrs. Ingram also claims that Benton, in the course of these telephone calls, would make remarks such as, "We really need Alan to return to work," and "I guess Alan has had himself a nice little two week vacation." Benton has acknowledged having stated that Acosta needed Ingram to return to work.

Ingram returned to work on September 8, 1998,[1] and was terminated on September 10, 1998. Ingram claims that he was never given verbal or written notice of his rights under the FMLA, and notes that both his supervisor at Acosta, Benton, and Benton's direct supervisor, a retail sales manager at Acosta, Jimmy Contorupis, acknowledge that Acosta does not generally inform an employee who is calling in sick of his rights under the FMLA.

B. Additional Facts as Presented by Acosta

Acosta is a food broker representing a number of food manufacturers. Acosta employees sell and promote the products produced by their clients to grocery stores and similar establishments. Acosta employees are also responsible for overseeing the introduction of new products, and the marketing, display and presence of their clients' products in appropriate quantities and appropriate conditions. Ingram, who was a territory

---

[1] Ingram's initial summary judgment brief avers that Ingram returned to work due to pressure exerted by Benton and that Ingram had not yet seen his doctor to obtain approval for his return. Ingram's deposition testimony however, indicated that Ingram did return to work pursuant to his doctor's approval.

manager, was responsible for working closely with stores in his area to promote, market and re-stock those stores with products from Acosta's clients, and for maintaining a working relationship with the decision-makers at the stores.

Ingram spent very little time in Acosta's offices, as it was his job to regularly call on stores in his area. Nonetheless, he would come in about once every six weeks for sales or retail meetings. Territory managers at Acosta generally communicate with their superiors on a day-to-day basis through the use of telephone calls and voice mail. They meet with supervisors about once every three weeks. Acosta notes that, because of the lack of direct interaction between upper management, supervisors and territory managers, supervisors are forced to place a great deal of trust in the territory managers.

According to Acosta, the story of Ingram's termination begins well before August of 1998. Acosta contends that Ingram's dismissal resulted from his exceptionally poor job performance beginning in April of 1998 and continuing up until his termination. Acosta cites a number of instances where Ingram's poor job performance was documented:

> April 30, 1998 - Ingram received a Consultation Form write-up for failing to make payments on his company American Express account and for failing to make payment on a storage building. The credit card was canceled and the building lease was terminated. Ingram acknowledges that Jimmy Contoruptis, the regional sales manager in his area, expressed his displeasure over these incidents. As Benton was also aware of these problems, he began to be concerned over Ingram's lack of organization and planning. Ingram also received a Consultation write-up on this same day for having failed to attend a store set that had been set up. Ingram was informed of the event, but claims that Benton should have called him to confirm the necessity of his attendance.

- May 5, 7, and 8, 1998 – Benton documented his belief that Ingram, despite claiming the contrary, had not visited his accounts and had not performed his duties.  Benton claimed to have been unable to find any evidence of Ingram's having been present at his appointed stores.

- July 6, 1998 – Benton documented complaints that Ingram had, in re-setting a store, left out certain products.

- July 30, 1998 – Benton, upon auditing one of Ingram's accounts, discovered serious, major discrepancies between the condition of the store and Ingram's reports.  Benton contends that the discrepancies were more significant than any he had ever witnessed.  Benton's report states that he met with Ingram on that same day to discuss the problems and that Ingram had no explanation for the poor reporting.

- August 18, 1998 – Benton again audited a report produced by Ingram, finding discrepancies similar to those found on the July 30th report.  Benton claims that he went looking for Ingram that same day, eventually finding him at home around 2:30 in the afternoon – while Ingram should have been at work.  Benton claims that, when confronted with the problems, Ingram claimed only that his eyesight was bad.

Because of the concerns generated by these incidents, Benton drafted a memo to Contorupis on August 19, attaching his findings from the August 18 audit.  Contorupis and Benton claim to have met that day to discuss Ingram's past problems.  As a result of their meeting and a same-day discussion with Acosta general manager Jerry Foskey, they claim to have decided to fire Ingram.  The official decision to fire him was apparently made two days later, on August 21, 1998.  Benton and Contorupis, although intending to go to Ingram and fire him on the 21st, were unable to do so.

Acosta acknowledges that Ingram called Benton on August 24 to tell him that he (Ingram) would not be at work that day due to a pulled muscle in his back.  Ingram, by his own admission, told

Benton that he did not know when he would be able to return to work and does not recall telling Benton of any scheduled meetings. Ingram and Benton spoke again on August 26th. During the August 26th conversation, Ingram again told Benton that he had pulled a muscle in the lower part of his back. Ingram told Benton that he would miss at least a week of work. Ingram, or his wife, spoke to Benton over the telephone several times over the following week.

Ingram saw his physician once a week for the two weeks he was home from work, and was cleared for work on September 8, 1998.[2] According to Acosta, it took two days for Benton and Contorupis to arrange to go together to Ingram's territory. On September 10, 1998, Benton and Contorupis met Ingram at one of his accounts and informed him that he was being fired for poor performance. Ingram admits that the three met for about an hour and that Benton and Contorupis, during that hour, discussed with him the various poor-performance write-ups in his file. Ingram also admits that no mention was made of his recent absence.

Acosta notes that although no mention of the FMLA was made by itself or by Ingram in connection with his absence, Ingram received individualized notification of his rights under the statute and Acosta's policy in reference to the statute when he received Acosta's Employee Handbook in September of 1997. Ingram acknowledges receipt of the handbook and, consequently, of the FMLA policy outlined inside. He also acknowledges that he signed a form indicating that he had received the handbook and would become familiar with it. Acosta also claims that Ingram, in returning to

---

[2] Again, although Paragraph 38 of his complaint claims otherwise, Ingram now admits that he was not forced to return to work without his doctor's authorization.

the office about every six weeks, was exposed to an FMLA poster located in the mail room, which Ingram admittedly entered each time he visited the office. Finally, Acosta notes that even if some of the requirements of the FMLA were not followed in granting his leave, he was, nonetheless, paid for the time he was out due to injury - Ingram was placed on paid leave.

III. Arguments as to Count I - Retaliatory Discharge

Ingram contends that, according to Mora v. Chem-Tronics, Inc., 16 F.Supp.2d 1192, 1218 (S.D.Cal. 1998)(citing 29 U.S.C. SS 2614, 2615, 2619), the FMLA places affirmative obligations on employers to (1) notify employees of their rights and obligations under the FMLA; (2) refrain from disciplining employees who take leave covered by the FMLA; (3) reinstate employees to the same or equivalent job after their leave; and (4) continue the employee's health care during their leave of absence. The FMLA entitles an eligible employee to take a total of twelve workweeks of leave during any twelve month period for serious health conditions that render the employee unable to perform his or her job functions. 29 U.S.C. § 2612(a)(1)(D). Ingram claims that Acosta violated its obligation to reinstate him by firing him two days after he returned from leave that he was entitled to. He further argues, citing King v. Preferred Technical Group, No. 98-1538, 1999 U.S.App. LEXIS 1112, at *13 (7th Cir. Jan. 28, 1999), that the fact that he was terminated in such close proximity to the time he took protected leave sufficiently demonstrates retaliation for having taken that leave. Ingram concludes that he is therefore entitled to summary judgment on Count I of his complaint.

A. Prima Facie Case

Courts analyzing retaliation claims under the FMLA use the same burden-shifting approach applied to claims brought pursuant to Title VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act, and other federal anti-discrimination statutes. Kaylor v. Fannin Regional Hospital, Inc., 946 F.Supp. 988, 1000 (N.D.Ga. 1996). As Ingram has no direct evidence of discrimination in this case and no statistical evidence to support his claim, he must resort to circumstantial evidence. In order to establish a prima facie case for termination in violation of the FMLA using circumstantial evidence, the plaintiff must show that: (1) he exercised a protected right; (2) he suffered an adverse employment action; and (3) there is a causal link between the exercise of the right and the negative action. Kaylor, 946 F.Supp. at 1001.

Defendant acknowledges, for the purposes of its summary judgment motion, that Ingram can meet his burden on the first two criteria, but argues that he is unable to establish the third requirement, noting that Ingram has produced no evidence controverting the claim that Benton and Contorupis decided to terminate his employment prior to his injury. The plaintiff, however, maintains that the proximity of the date of termination to the date of return from leave alone is sufficient to establish the necessary link under King. In addressing the causal connection element, the King court stated:

> This element may be satisfied by reference to the temporal proximity between [the plaintiff's] taking of protected leave and her termination. "Generally, a plaintiff may establish such a link through evidence that the discharge took place on the heels of a protected activity." Dey v. Colt Construction and Development Co., 28 F.3d 1446, 1458 (7th Cir. 1994). Evidence demonstrating such a connection "is generally enough

to satisfy the third element of the prima facie test."
Rabinovitz v. Pena, 89 F.3d 482, 489 (7th Cir. 1996). [The
defendant] terminated [the plaintiff] only one day after she
completed her leave of absence under the FMLA. Such a close
proximity is sufficient to establish a prima facie case of
retaliation. See e.g. McClendon, 108 F.3d at 797 (concluding
that a sequence of events over a 2-3 day period between the
protected activity and the adverse employment action was
sufficient to establish a prima facie case of retaliation).
King, at *13-14.

B. Legitimate, Non-Discriminatory Reason for Termination

Assuming that Ingram has established a prima facie case,
Acosta must articulate a legitimate, non-discriminatory reason for
the action taken. Kaylor, 946 F.Supp. at 1000-01. "This is not a
shift in the burden of persuasion but simply requires the employer
to present evidence to explain its actions. If successful, the
employer defeats the presumption of intentional discrimination
created by the prima facie case." Id. at 1001. In this case,
Acosta claims that Ingram was terminated not because of his
decision to take medical leave, but for his poor job performance
over a protracted period of time. Beginning in late April of 1998,
as noted above, Benton began to document a number of deficiencies
in Ingram's work performance. Ingram's signature appears on
several of the write-ups, indicating that he was aware of the fact
that his supervisor was not happy with his work. The audits done
on July 30 and August 18 in addition to Ingram's decision to leave
work without telling a supervisor represented the "final straw"
according to Benton. Benton claims that, by the time Ingram took
leave on August 24, he had lost all confidence in Ingram's
trustworthiness and reliability. Both Contorupis and Benton
contend that they had decided to terminate Ingram before he took
leave and that Ingram's decision to do so did not influence their

thinking. Thus, Acosta claims that its reason for terminating Ingram was legitimately based on his poor work performance.

C. Pretext Argument

Once a defendant has satisfied his burden of producing a legitimate, non-discriminatory reason for an adverse action, the burden shifts to the plaintiff to show that the articulated reason is merely a pretext for discrimination. Id. In attempting to make such a showing, Ingram notes that his performance evaluations always reached the level of "meets expectations." He has also submitted six "letters of recommendation" that Ingram received "from his customers while at Acosta." However, Ingram has not challenged the legitimacy or authenticity of the write-ups and complaints prepared by Benton and presented as evidence by Acosta. Further, although Ingram claims that he received the "letters of recommendation" from customers while he was with Acosta, the letters were, as noted by Acosta, actually sent to Ingram after his termination. Out of the six letters produced, four bear a November, 1998 date, and the other two refer to his employment or their observance of his performance in the past-tense. Only one of the letters leaves the slightest doubt as to whether it was produced after his termination. The letters produced by Ingram are completely irrelevant as to whether Acosta considered his performance level to be sub-par.

Ingram also attempts to refute Acosta's legitimate, non-discriminatory reason for terminating his employment by arguing that the evidence indicates that the decision to terminate him was not made prior to his taking leave. Benton admits to having called Ingram's home to find out when he would return to work and admits

to having told Mrs. Ingram that, "We really need Alan to come back to work." Further, Contorupis stated that plaintiff was allowed to return to work because the company "still had a job for him."[3] Ingram concludes that these statements indicate that Acosta had not yet decided to fire him when he began his leave on August 24, 1998. He claims to have therefore met his burden of showing that Acosta's reason is a mere pretext for discrimination. Acosta, on the other hand, argues that the statements mean nothing except that, as an employee, Acosta wanted Ingram back at work. To read anything more into such statements, argues Acosta, would amount to blind speculation. Acosta claims that Ingram has produced no evidence indicating that its articulated reason is anything but legitimate.

IV. Arguments as to Counts II and III

Ingram argues, citing 29 U.S.C. 2615 and 2617, that any act which constitutes an interference with, restraint of, or denial of an exercise or attempted exercise of a right provided by FMLA subjects an employer to liability. Ingram notes that Section

---

[3] Contorupis's statements are best understood in context. Regarding Ingram's return to work and the company's desire to see him do so, Contorupis testified as follows:

Q. If the decision had been made to terminate Mr. Ingram, then why did Mr. Benton call Mr. Ingram and say, "We really need him back at work"?

A. Because we need all employees working. They all have a job to perform.

Q. But if he was going to be fired, he wasn't going to be performing a job.

A. Still needed him back at work. Still had a job for him.

Q. But you testified during this time that ya'll had already decided to let him go.

A. That's correct. We still felt we needed to know when to expect him to return to work.

105(a)(1) of the Act and 29 C.F.R. § 825.220(b) state that "[i]t shall be unlawful for any employer to interfere with, restrain, or deny the exercise or the attempt to exercise any right provided under [the FMLA]." Ingram argues that this language does not restrict the causes of action available under the statute to instances where an employee has been terminated under the FMLA or denied leave under the FMLA. He further claims, citing 29 C.F.R. ss 825.301(b-c), 825.220(b), and Mardis v. Central National Bank and Trust of Enid, No. 98-6056, 1999 U.S.App. LEXIS 7261, at *7 (10th Cir. April 15, 1999), that the case law and regulations state that an employee has: (1) a right to receive notice of his rights upon requesting leave that could qualify under the FMLA; and (2) the right to be free from any attempt to discourage the taking of FMLA leave. Ingram further claims that Acosta may be held liable for violating Ingram's right to a consistent policy regarding medical leave, and for its allegedly illegal absenteeism policy. The parties contentions regarding each of these claims are outlined below, as are Acosta's general arguments regarding its liability for interfering with Ingram's rights under the statute.

A. Count II: Notice

According to Ingram, the FMLA requires an employer to inform an employee of his rights under the FMLA at the time the employee requests leave covered by the statute. Acosta's policy, according to Ingram, clearly violates this requirement. The regulations passed pursuant to the FMLA state that "the employee need not expressly assert rights under the FMLA or even mention the FMLA." 29 C.F.R. § 825.302 (1997). The regulations further state that "[t]he employer should inquire further of the employee if it is

necessary to have more information about whether FMLA Leave is being sought by the employee, and obtain the necessary details of the leave to be taken." Id. Finally, while an employer may have certain internal requirements for requesting medical leave, "failure to follow such internal employer procedures will not permit an employer to disallow or delay an employee's taking FMLA leave . . ." Id. According to Ingram, Gay v. Gillman Paper Co., 125 F.3d 1432 (11th Cir. 1997), supports his contention that an employee need not expressly invoke the FMLA to obtain its protection, provided the employer is aware that the employee is seeking leave for reasons covered by the statute.

Ingram argues that the facts in this case show that Acosta failed to provide him the mandated notice at the time of his injury. Acosta, in responding to this portion of Ingram's argument, points to the fact that Ingram received an employee handbook outlining the company's FMLA policy. Ingram has acknowledged, as noted above, that he received the handbook, that it contained detailed FMLA information, and that he signed a document assuring the company that he would familiarize himself with the contents of the handbook. Also notable, according to Acosta, is the fact that Ingram had the opportunity about once every six weeks to view an FMLA poster in the company's mail room. The regulations regarding the posting of FMLA notices require an employer to insure that the notice "be posted prominently where it can be readily seen by employees . . ." 29 C.F.R. § 825.300(a). Ingram argues that, because he could only have seen the notice once every six weeks, Acosta clearly failed to comply with the posting requirements. Ingram claims that cannot recall having seen the

poster, and defendant has offered no proof to the contrary. Further, the regulations require that the posting provide information concerning the procedures for filing complaints for violations of the Act. 29 C.F.R. § 825.300(a). Acosta has failed to establish that the notice posted in its mail room meets the requirements of the regulations. Thus, argues Ingram, this court cannot grant summary judgment on Count II of its complaint.

Ingram also notes that 29 C.F.R. § 825.301(b) and (c) outline the type of FMLA information that must be included in an employee handbook. Specifically, 29 C.F.R. § 825.301(b) provides that written notice must contain the specific expectations and obligations of the employee, the consequences of failure to meet these obligations, that leave will be counted against the employee's annual FMLA leave entitlement, any medical certification requirements, the employee's right to substitute paid leave, any requirements for health benefits, any requirements for restoration to employment, the employee's right to restoration to the same or an equivalent job upon return, and other information. Additionally, 29 C.F.R. § 825.301(c) requires that this information be provided "no less often than the first time in each six-month period that an employee gives notice of the need for FMLA leave. . ." Acosta has, according to Ingram, provided no evidence indicating that this information was provided or that these requirements were met.

Ingram maintains that Acosta's practice of requiring an employee to specifically request FMLA in order to be given statutory leave violates the FMLA and its governing regulations. FMLA regulations, as noted above, require an employer to obtain

more information from the employee if the employer is unsure as to whether FMLA leave is appropriate. Acosta did not, in Ingram's case, and, apparently, does not regularly attempt to obtain such information. Acosta employees have admitted that Ingram was given no notice of his rights and responsibilities under the FMLA upon notifying the company of his injury. Ingram contends that placing the burden of requesting statutory leave on an employee in this manner violates the statute, as Acosta had a duty to inquire further into whether the FMLA would apply in his case. Because Acosta failed to make such an inquiry, because Ingram argues that summary judgment is warranted in this case.

B. Acosta's General Argument Against Liability Under Count II

The FMLA does not provide an employee on leave any greater job protections than other employees who are not on leave. 29 C.F.R. § 825.216(a). See also <u>Kariotis v. Navistar International Transp. Corp.</u>, 131 F.3d 672, 671 (7th Cir. 1997). Acosta argues that the FMLA does not allow an independent cause of action for failure to give an employee notice that their leave is or is not pursuant to the FMLA if the employer actually provides leave in accordance with the Act. Acosta, like Ingram, notes that Section 105(a)(1) of the Act and 29 C.F.R. § 825.220(b) state that "[i]t shall be unlawful for any employer to interfere with, restrain, or deny the exercise or the attempt to exercise any right provided under [the FMLA]." Acosta also notes that a plaintiff, to state a cause of action for violation of his or her rights under the FMLA, must state a claim under Section 105(a)(1). A plaintiff, states Acosta, may not simply pick and choose from the FMLA's various requirements of employers, claiming each violation as actionable, without showing

that the employer has actually interfered with a right under the
Act.  Acosta maintains that, in this case, Ingram received all of
the rights, both substantive and prescriptive, that he was entitled
to under the FMLA.  Ingram was placed in a leave status and was
allowed, even if for a short time, to return to his job.  He was
even provided with paid leave – a benefit not required by the FMLA.
Thus, argues Acosta, regardless of whether any reference to the
FMLA was ever uttered, Ingram received that to which he was
entitled under the Act.  Acosta contends that the "violations"
cited by Ingram did not, therefore, "interfere" with his rights.
Thus, he cannot state a cause of action under the FMLA.

Acosta contends that, while the regulations may speak in terms
of notice at the time of leave, both Dodgens v. Kent Manufacturing,
Co., 955 F.Supp. 560, 564-65 (D.S.C. 1997), and Jessie v. Carter
Health Care Center, Inc., 926 F.Supp. 613, 617 (E.D.Ky. 1996),
support the principle that employers who fail to provide this
notice are not liable to plaintiffs because a private right of
action does not exist for violation of the notice requirement.
Thus, in Dodgens, the court held that despite an employer's failure
to explain applicable FMLA provisions to the plaintiff at the time
the plaintiff requested leave, "the court would be elevating form
over substance to permit this claim to go forward in light of the
fact that [the plaintiff] received all of the leave benefits he was
guaranteed pursuant to the FMLA."  Dodgens, 955 F.Supp. at 564-65.
Similarly, the court in Jessie found that a "notice claim" under
the FMLA does not fall within the scope of section 2617(a), which
affixes liability on an employer who interferes with an employee's
FMLA rights, and thus concluded that a private right of action did

not exist for a violation of the notice requirement.

Finally, Acosta points out that the only case cited by Ingram in his discussion of Count II is Gay v. Gillman Paper Co., 125 F.3d 1432 (11th Cir. 1997). Ingram cites Gay to establish the fact that the Eleventh Circuit has adopted the federal regulations discussing the FMLA as controlling authority, to support his contention that an employee need not expressly invoke the FMLA to obtain its protection, and to claim that an employer's failure to adhere to the FMLA's notice requirements is actionable by an employee. Acosta does not contest the first two assertions made by Ingram concerning Gay, although it notes that the second is irrelevant given the fact that Ingram received all of his rights under the statute. Acosta does take issue, however, with Ingram's very important third claim. Rather than concerning the question of whether an employee may state a claim for an employer's failure to comply with the FMLA's notice requirements, Gay involved the question of whether the employee provided adequate notice to allow her employer to consider her leave to be covered by the FMLA. The court held that the employee failed to provide sufficient notice and thus affirmed the lower court's grant of summary judgment in favor of the employer. Acosta thus argues that Gay cannot possibly stand for the proposition that an employee may state a claim against an employer for failure to adhere to the FMLA's notice requirements and notes that Ingram has, therefore, provided no case law in support of his contention that the FMLA provides for a private cause of action in this case.[4]

---

[4]This court agrees and will grant the motion as to Count II. The failure to give notice, if applicable, might have a bearing on limitations tolling issues, but it does not establish a cause of

C. Count III: Interference with Rights

     1. Medical Documentation; Right to be Subject to Consistent Policy Without Pressure to Return to Work

In addition to claiming that Acosta violated the FMLA by failing to make further inquiry into the nature of his injury for purposes of determining if the FMLA applied, Ingram also claims that Acosta "interfered with his rights" under the statute by later requiring in depth medical documentation of his injury. Ingram notes that both the FMLA and the Department of Labor regulations allow an employer to utilize a uniformly applied policy requiring employees to receive certification from their health care provider that the employee is able to resume work. 29 U.S.C. § 2614(4); 29 C.F.R. § 825.310(e). The employer must also give the employee notice of this requirement at the time the employee notifies the employer he or she will take leave or "immediately after leave commences." Id. "The certification itself need only be a simple statement of an employee's ability to return to work." 29 C.F.R. § 825.310(c).

Ingram argues that Acosta violated the FMLA by failing to establish a consistent policy with regard to medical certification. Benton's deposition testimony indicates that Acosta does not follow a uniform policy, as he states that whether an employee is required to produce certification "depends on the circumstances." In this case, Benton did inform Ingram of Acosta's desire to get a certification from him, but was unsatisfied with the basic form of the certification, and requested that Ingram procure more detailed documentation of his injury - a request not always made of Acosta

_____

action, particularly when the only relief which could be sought has been given.

employees. Ingram notes that, when presented with the certification, Benton said that "Anyone could purchase one of those excuses." Although Acosta claims that Benton was simply trying to determine the true nature of Ingram's injury, Ingram claims that Acosta's behavior (through Benton) interfered with his right under the statute to be free from such a requirement and that such behavior, as a matter of law, amounts to a violation of the FMLA.

Ingram further contends that, by pressuring him to provide more detailed information regarding his injury than is required by law and by making numerous phone calls to his home, Acosta interfered with his rights under the FMLA. Ingram argues that Benton's multiple calls to his home requesting more information and encouraging Ingram to return to work amount to a violation of his statutory rights and claims that summary judgment is proper given Benton's acknowledging having made the several phone inquiries.

Acosta maintains that the telephone calls made in this instance were not for the purpose of harassing Ingram. Rather, says Acosta, they were made in the interest of knowing when he would return to work. Even Ingram's testimony regarding the phone conversations indicates that he was extremely vague both in describing his injury (he referred to it as a pulled muscle) and in communicating when he would return to work (he first told Benton that it would be a couple of days, then a couple more days, and then another whole week). Acosta claims that because Ingram was so vague, Benton was forced to make numerous calls to his home merely to determine Ingram's status.

Acosta also argues that, to the extent that Benton's calls

during Ingram's second week of leave were of a somewhat harassing nature – Mrs. Ingram claims that he made three or four calls to the house during that week requesting more information and telling her that the company needed Ingram at work – such inquiries do not support a claim under the FMLA and do not constitute a violation of Ingram's rights.  Acosta points to <u>Dodgens v. Kent Manufacturing, Co.</u>, 955 F.Supp. 560, 564-65 (D.S.C. 1997), in which the court held that such allegations do "not state a cognizable claim under the FMLA," and notes that the situation in <u>Dodgens</u> was more egregious than that described in this case.  In <u>Dodgens</u>, the employer called the employees home on numerous occasions with the goal of convincing the employee to accept a demotion.  Finally, Acosta notes that there is no evidence  indicating that Benton's calls induced Ingram to return to work earlier than he otherwise would have.  Contrary to statements made in Ingram's initial brief, Ingram did not return to work until his doctor approved such return.

2. Right to Absenteeism Policy that Complies With the FMLA

Acosta's absenteeism policy also, according to Ingram, violates the FMLA and thus interfered with his rights.  The FMLA prohibits an employer from discharging or disciplining an individual who takes leave which is covered by the Act.  29 C.F.R. § 825.220(a) (1997).  The FMLA also prohibits an employer from discouraging the use of FMLA leave.  29 C.F.R. § 825.220(b) (1997).  Specifically, the FMLA prohibits employers form discriminating against employees who take leave covered by the statute.  29 C.F.R. § 825.220(c) (1997).  "Employers cannot use the taking of FMLA

leave as a negative factor in employment actions, such as hiring, promotions or disciplinary actions. . . ."  Id.

Acosta's absenteeism policy states "excessive absenteeism . . . can result in discipline or discharge."  Ingram contends that, under this policy, an employee taking leave under the FMLA could be disciplined or discharged for doing so, and that the policy therefore interferes with an employee's right to twelve weeks of leave pursuant to FMLA provisions.  Ingram argues that this interference, along with the others noted above, entitle him to judgment as a matter of law on Count III of his complaint.

Acosta argues that Ingram has, again, failed to state a claim for interference with his rights, noting that Benton's testimony regarding the company's absenteeism policy does not, at any point, indicate that the policy allows discipline or dismissal for protected leave.  Rather, says Acosta, Benton was answering questions concerning the company's basic absenteeism policy as asked by plaintiff's attorney.  At no time during their discussion regarding Acosta's absenteeism policy did either plaintiff's attorney or Benton refer to the FMLA.  Acosta also notes that Ingram's lawsuit has nothing to do with its absenteeism policy, and argues that Ingram's claim regarding that policy is completely irrelevant, as Ingram could not have been injured by a policy that he was not fired under.

D. Acosta's General Argument Against Liability Under Count III

Acosta argues that the reasoning used by the Dodgens court applies to Count III of Ingram's complaint to the same extent it applies to Count II.  Thus, according to Acosta, Count III fails to state a legitimate claim under the FMLA.  Acosta contends that,

just as the plaintiff in <u>Dodgens</u>, Ingram ultimately received the treatment to which he was entitled under the FMLA. The "violations" which he cites do not, therefore, constitute "interference" under the FMLA and do not state a cause of action.[5]

V. Per Se Negligence Under Alabama Law

Count IV of Ingram's complaint maintains that, under Alabama law, an employer who injures an employee after failing to follow the FMLA is negligent per se. In Alabama, the test for incorporating a statute as a standard of care for the purposes of a negligence claim requires the plaintiff to show that: (1) the statute in question was enacted to protect a class of persons that includes the litigant; (2) the injury complained of is the type contemplated by the statute; (3) the party charged violated the statute; (4) the statutory violation caused the plaintiff's injury. <u>Allen v. Delchamps</u>, 624 So.2d 1065, 1067 (Ala. 1993). Ingram maintains that he has sufficiently established each of the above criteria. He notes that the FMLA was enacted to protect employees who seek medical leave for themselves, or to attend to immediate family members. 29 C.F.R. ss 825.100, 825.101. He contends that his injury is clearly the type the statute is meant to apply to, as he was discharged from his job. Ingram claims that his arguments regarding Counts I-III of his complaint establish the fact that Acosta violated the FMLA, and that his injury was caused by such violations. According to Ingram, Acosta had a duty under the FMLA to provide him with notice of his rights and to honor his rights as provided in the Act.

---

[5]This court agrees and will grant summary judgment as to this claim.

A. FMLA Preemption of State Law

Acosta argues that Ingram's negligence claim fails for several reasons. First, Acosta claims that the FMLA provides an adequate remedy to redress any injury Ingram might have sustained. Acosta notes that the FMLA provides a private right of action, as described above, against employers who have interfered with a plaintiff's rights or discriminated against an employee in a manner that violates the Act, and that an employee can, under 29 U.S.C. § 2617(A)(1)(e), recover lost wages, salary, benefits and other money damages, in addition to liquidated damages meant to deter future violations. Acosta argues that, because the Alabama legislature has not enacted a law providing greater benefits and rights for those on medical leave than does the FMLA,[6] the FMLA provides Ingram's exclusive remedy. Acosta contends that, by basing his negligence claim on FMLA standards, Ingram is, in effect, attempting to create his own state family and medical leave act. Acosta suggests that <u>Lange v. Showbiz Pizza Time, Inc.</u>, 12 F.Supp.2d 1150 (D.Kan. 1998) and <u>Hamros v. Bethany Homes and Methodist Hosp. of Chicago</u>, 894 F.Supp. 1176 (N.D.Ill. 1995), dictate a finding that Ingram's state claim is preempted because of adequate federal remedies. In <u>Lange</u>, the court found that the plaintiff could not assert a claim for retaliatory discharge under state law because the FMLA provided an adequate remedy. In <u>Hamros</u>, the court granted an employer's motion to dismiss a plaintiff's retaliatory discharge claim under state law, also because the FMLA

---

[6] 29 U.S.C. § 2651 states that the FMLA will not "supersede any provision of any state or local law that provides greater family or medical leave rights than the rights established under [the FMLA]." Such is not the case here, as Alabama has not done so.

provided a private right of action and statutory remedies. Other federal cases in which courts have found that a former employee's duplicative state law tort claims were preempted due to adequate federal remedies, according to Acosta, include: McClain v. Southwest Steel Co., Inc., 940 F.Supp. 295 (N.D.Okla. 1996), Day v. Excel Corp., 1996 WL 294341 (D.Kan. May 17, 1996), and Conner v. Schnuck Markets, Inc., 121 F.3d 1390, 1399 (10th Cir. 1997).

Although the Alabama Supreme Court has never squarely addressed this issue, Acosta argues that Grant v. Butler, 590 So.2d 254 (Ala. 1991) involved an analogous scenario. In Grant, the employees alleged that they were terminated for reporting hazardous work conditions and that they were entitled to recover from the employer in tort for bad faith breach of an implied covenant of good faith and fair dealing. The court rejected their argument, finding that it was unnecessary to create a new tort remedy where the anti-retaliation provision of the Occupational Health and Safety Act provided an adequate remedy. Acosta contends that this court should do the same with respect to Ingram's negligence claim.

Ingram argues that the FMLA does not supersede Alabama negligence law because the two "are not similar schemes of regulation." While Section 401 of the Act provides that the FMLA does not preempt federal or state antidiscrimination laws and does not preempt state family medical leave laws that offer more protection than does the Act, the FMLA is silent as to whether it preempts claims that incorporate provisions of the FMLA as the standard of care in state law negligence actions. Ingram argues that Smith v. Wal-Mart Stores, Inc., 1999 U.S.App. LEXIS 944 (Jan. 27 1999), provides support for the contention that the FMLA may be

used to set the standard of care in a negligence action. Ingram notes that, in <u>Smith</u>, the Sixth Circuit held that a violation of the Americans with Disabilities Act could constitute negligence per se under Georgia law. The court, according to Ingram, did not analyze the issue in terms of preemption, but examined it by deciding whether Georgia courts would incorporate the ADA for purposes of a negligence per se claim. Ingram thus concludes that the appropriate question in this case is not whether federal law preempts Alabama law, but whether Alabama courts would utilize FMLA standards to establish a standard of care in a negligence per se action.

Acosta points the court's attention to the facts of the <u>Smith</u> case, arguing that they do not square with those of this case. Acosta notes that the violations of the ADA claimed by the plaintiff in <u>Smith</u> were provisions of the ADA that did not provide independent causes of action. The plaintiff in <u>Smith</u> was alleging violations of ADA-mandated building code provisions which require grab bars and handrails in toilet stalls. Failure to install such devices does not provide a private cause of action under the ADA. Thus, the court in <u>Smith</u> found that the plaintiff could recover under Georgia's Statute § 51-1-6, which specifically states, when no other "cause of action is given in express terms, the injured party may recover for the breach of such legal duty if he suffers damage thereby."

Acosta also notes, citing <u>Phillips v. DAP</u>, 10 F.Supp.2d 1334 (N.D.Ga. 1998), <u>Mandell v. USC Communications, Inc.</u>, 73 FEP Cases (BNA 732 (N.D.Ga. 1996)), and <u>Jairath v. Dyer</u>, 972 F.Supp. 1461 (N.D.Ga. 1997), that Georgia courts have not allowed plaintiffs to

use this statute when a specific cause of action already exists under either federal or state law. Acosta asserts that, even if the Sixth Circuit's argument is accepted in lieu of the Alabama Supreme Court's interpretation of an analogous situation, because the FMLA already provides a remedy for interference with the rights it creates, Ingram's claim fails. Acosta also asserts, once again, that Ingram's only potential injury in this case came in the form of his termination. Although Ingram makes vague references to 'other injuries," he has failed, says Acosta, to identify exactly what those injuries might be.

B. At-Will Employment and Public Policy

Acosta also argues that, even if this court rejects its argument concerning the FMLA's preemption of Ingram's negligence claim, Alabama public policy is not implicated in this situation. Acosta contends that Ingram's claim, while characterized as a negligence claim, is actually an attempt to make a claim for the tort of wrongful discharge. The Alabama legislature has not created a cause of action prohibiting employers from discharging at-will employees for exercising their rights under the FMLA, and, says Acosta, cases such as Howard v. Wolff Broadcasting Corp., 611 So.2d 307 (Ala. 1992), illustrate the fact that the Alabama Supreme Court will not unilaterally create public policy exceptions to this general rule, even if a given employee is discharged for discriminatory reasons. In Alabama, an at-will employee may be terminated for "a good reason, a wrong reason, or no reason." Hinrichs v. Tranquilaire Hosp., 352 SO.2d 1130, 1131 (Ala. 1977). In Howard, the plaintiff was allegedly terminated based on gender. The Alabama Supreme Court held that the employment at-will doctrine

applied and that the employer could not be held liable under Alabama law for wrongful termination. In doing so, the Court stated, "In refusing to adopt a 'public policy' exception, we should not be understood as condoning a person's discharge because of gender. We merely hold that it is the province of the legislature to create such an exception . . ." Acosta thus urges this court to ignore Ingram's request to create a new public policy exception and to grant its summary judgment motion as to Count IV of Ingram's complaint.

Ingram claims that Acosta's at-will employment argument is irrelevant to whether or not Ingram can maintain a negligence per se action in this case. He argues that the four part test described above should be applied to the facts of this case and that the facts of this case allow for an action under state law. Ingram argues that his claim satisfies the elements for per se negligence and that his injuries extend beyond the loss of employment. He therefore claims that he is not asking this court to create an exception to the employment-at-will doctrine.

C. Acosta's General Argument Against Liability Under Count IV

In Acosta's final argument against Ingram's negligence claim, the company asserts that, even if this court were to decide that Ingram could recover in negligence for violations of the FMLA, Ingram's claim would still fail due to the fact that his claims are without merit. Acosta claims that, in order to succeed in his Alabama tort claim, Ingram would have to establish the existence of the violations he outlines in Counts I-III of his complaint. As he has, according to Acosta, failed to do so, his Count IV claim must also fail.

### Further Conclusions Of The Court

The court, after fully considering the facts and legal arguments, will grant the defendant's motion as to Counts II, III and IV.   The negligence claim is preempted, duplicative and provides no independent basis for a claim of damages.   The court will deny the motion as to Count I.   While the issue is close, there may be some arguable basis of a reasonable inference of retaliation.   The court will carefully reassess the evidence at trial.

This _____ day of June, 1999.


**ROBERT B. PROPST**
**SENIOR UNITED STATES DISTRICT JUDGE**